## Jacob Bunn *et al.*

*v.*

## The People of the State of Illinois *ex rel.* Matthew Laflin.

1. Constitutional law — *construction of the act to provide for the erection of a new State house.*   The act of the legislature of 1867, providing for the erection of a new State house, is not in violation of section 12, article 4, of the Constitution of this State.

2. Officers — *officers who are not — within the meaning of the Constitution.*   The commissioners appointed under this act, are not officers within the meaning of the Constitution, but mere agents or employees for a single and special purpose, whose functions are at an end upon the completion of the work.

45   397
155   119
45   397
171   77
45   397
175   603
45   397
182   165
45   397
183   236
45   397
201   256
45   397
208   ⁴352

3. SAME. A person employed for a special and single object, in whose employment there is no enduring element, nor designed to be, and whose duties, when completed, although years may be required for their performance, *ipso facto* terminate the employment, is not an officer, in the sense in which that term is used in the Constitution.

4. SAME — *in determining who are — practice under the Constitution may be considered.* In determining whether these commissioners are "officers," it is proper to take into consideration the uniform, contemporaneous and continuous construction given by the legislature since the adoption of the Constitution, to the clause in question, and from the construction thus given it, it must be concluded, that they are not to be regarded as "officers," and that such clause has only reference to such officers as had some portion of the functions of government committed to their charge.

5. FORMER DECISIONS. The cases of *Dickson* v. *The People, etc.,* 17 Ill. 191, and *The People* v. *Ridgely et al.,* 21 id. 65, cited and explained.

6. CONSTITUTIONAL LAW — *concerning the exercise of the power to declare legislative acts unconstitutional.* The presumption is always in favor of the validity of a law, and unless it is in plain and obvious conflict with the Constitution, this court will not pronounce against its constitutionality. And in doubtful cases, the doubt should be in favor of the legislative power.

WRIT OF ERROR to the Superior Court of Chicago.

This was a proceeding by information in the nature of a *quo warranto,* instituted in the court below by the defendant in error, against the plaintiffs in error, Jacob Bunn, John W. Smith, James H. Beveridge, James C. Robinson, William T. Vandeveer, Phillip Wadsworth and William L. Hambleton, to test the constitutionality of the act of the legislature of 1867, providing for the erection of a new State house, upon the ground that the commissioners appointed under said act (plaintiffs in error) were "officers," within the meaning of the Constitution, and, being such, the mode of their appointment was in conflict with section 12, article 4 of the Constitution of this State. A demurrer was filed to the information, upon which issue was joined, and thereupon, the court pronounced a judgment of ouster against the respondents, to reverse which the case is brought to this court by writ of error.

Messrs. BECKWITH, AYER & KALES, Mr. E. A. STORRS, Messrs. PALMER & HAY and Messrs. STUART, EDWARDS & BROWN, for the plaintiffs in error.

Messrs. ARRINGTON & DENT, for the defendant in error.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:

The only question presented by this record is this: Are the commissioners appointed by the act of February 25, 1867, entitled "An act to provide for the erection of a new State house," officers, within the meaning of the twelfth section of the fourth article, and of the twenty-third section of the fifth article, of the Constitution of this State?

Section 12 is as follows: "The governor shall nominate, and, by and with the advice and consent of the senate (or majority of all the senators concurring), appoint, all officers whose offices are established by this Constitution or which may be created by law, and whose appointments are not otherwise provided for; and no such officer shall be appointed or elected by the general assembly."

Section 23 of article 5 is as follows: "The election of all officers, and the filling of all vacancies which may happen by death, resignation or removal, not otherwise directed or provided for by this Constitution, shall be made in such manner as the general assembly shall direct; *provided*, that no such officer shall be elected by the general assembly."

The question has been argued with great ability on both sides, and we submit the conclusions to which we have arrived, with some of the reasons therefor.

A solution of the question is attempted by the counsel for relator, by reference to definitions of the term "office" as found in law writers and dictionaries, in which there is not entire harmony. It is not pretended that the plaintiffs in error are officers whose offices were created by any law in force prior to the passage of the act in question, but the complaint is, that by the law defining the employment, and designating the persons who are to be employed, in the act itself, was, in effect, the appointment of those persons to an office, the employment being of such a nature as to render it continuous, and it exists apart from the incumbents, the place remaining though the

person that fills it may be removed. It is, say counsel, a place that may be filled or may be vacant; it is a place in fact permanent, since no limit in time has been fixed by law for its termination; a bond is required before they enter upon the performance of their duties, and an oath must be taken for faithful performance, and the place has emoluments, the compensation being fixed at five dollars per day for time of actual service; therefore, they say, the corollary results, that the employment or agency of these commissioners is a continuing one, which concerns the public, and is exercised on behalf of the government, and the rights, powers and duties of which are defined by law.

Books of high authority, Blackstone's and Kent's Commentaries, are referred to, giving the definition of an office, both of which definitions counsel admit are faulty in predicating fees or emoluments as attributes of office. Other definitions, by other law writers, are also given, but the best description of an office, in the judgment of counsel, to be found in the books, is that in Carthew's Reports, 478, 479. There it is said, " The word *officium* principally implies a duty, and, in the next place, the charge of such duty; and it is a rule, that, where one man hath to do with another man's affairs against his will, and without his leave, that is an office, and he who is in it is an officer." " Every man is a public officer who hath any duty concerning the public, and he is not the less a public officer when his authority is confined to narrow limits; because it is the duty and nature of that duty which make him a public officer, and not the extent of his authority."

References are then made to adjudged cases supposed to be in harmony with the definitions and with logical corollaries from them.

We do not propose to go over the whole ground occupied by the counsel on either side, or comment very much on the authorities produced supposed to bear on the question, but shall content ourselves with giving a few reasons why we cannot hold the plaintiffs in error to be officers within the meaning of the Constitution, and that the practice under the Constitu-

tion for a long series of years, unchallenged and unquestioned, can be resorted to as affording strong evidence of the meaning of any phrase or term used in it.

Under the first Constitution of this State, nearly all the important offices of government were filled by an election on joint ballot of the two houses, — that is, by the action of the general assembly alone. The evil produced was, that the legislature became the great appointing power, giving rise to injurious combinations affecting the purity of legislation. The passage of a law, or its defeat, might be made to depend on the election of a particular individual to a particular office. When the convention was called by which the present Constitution was framed, one of the great objects to be effected by the call was to deprive the legislature of the power to elect or appoint such officers as had been appointed by that body under the old Constitution, such as judges of the Supreme, Circuit and inferior courts, the auditor and treasurer of State and many others, whose functions were directly connected with some one or more of the departments of government which the Constitution had established, and who were to aid in carrying on the government.

Therefore, when the Constitution says that no office established by that instrument, or created by law, shall be filled by appointment or election of the general assembly, the framers of it had direct and immediate reference and application only to such offices as were created for the purpose of administering the three departments of government organized by it. This we establish by reference to the repeated appointment, by the general assembly, to places of public employment, of individuals on whom the appointment devolved by the law itself. A full list of such legislative acts, furnished by the counsel for plaintiffs in error, showing a contemporaneous and continuous action of the general assembly in the appointment of persons to employments or positions not designed to aid either department of the government in exercising its functions, affords strong evidence of the meaning of the term "such officer," as used in the Constitution. Such appointments commenced with the

26 — 45TH ILL.

first session, held in 1849, under this Constitution, and have been repeated at almost every session since, and they, too, of every grade of importance, from the appointment of commissioners to locate State roads, in relation to the Supreme Court rooms, in relation to public buildings, to complete the present State house, appointing commissioners to take evidence in relation to claims against the State, to appoint commissioners to build a house for the governor, — in short, for very many public purposes, including the act to locate and build an additional penitentiary, in which the commissioners were named as in the act in question, and provision made for filling vacancies.

These acts, passed by legislatures, and approved by governors of different political sentiments, many of whom were sound constitutional lawyers, and all of them of approved patriotism, and who had been sworn to support the Constitution in all its purity, is strong evidence that such appointees were not " such officers," as they were inhibited by that instrument from appointing.

But it is said by defendant's counsel, that these appointments were of a transient, evanescent character, terminating when the object was accomplished — that there were no continuous duties devolved on them, no vacancies to be filled.

The opinion of that most eminent jurist, Chief Justice MARSHALL, *clarum et venerabile nomen!* delivered on the Circuit, in the case of the *United States* v. *Maurice,* reported in 2 Brockenbrough, 103, is cited as a full illustration of this idea. We have read this opinion with great profit, and have endeavored to fashion this in accordance therewith. It may be said of that most distinguished man, " now to the grave gone down," that, no matter what the subject might be, howsoever intricate or discolor'd, when committed to the wonderful alembic of his mind, drops of purest, brightest distillation, were the uniform result! That case was an action of debt on the official bond of Maurice, who had been appointed agent of fortifications, and his sureties, and they raised the question by demurrer, that such an agent was not an officer. The chief justice, in answer to the question, is the agent of fortifications

an officer of the United States? defines what he understands an office to be. "It is a public charge or employment, and he who performs the duties of the office is an officer. If employed on the part of the United States, he is an officer of the United States. Although an office is an 'employment,' it does not follow that every employment is an office. A man may certainly be employed under a contract, express or implied, to do an act or perform a service without becoming an officer. But if a duty be a continuing one, which is defined by rules prescribed by the government, and not by contract, which an individual is appointed by government to perform, who enters on the duties pertaining to his station without any contract defining them, if those duties continue, though the person be changed, — it seems very difficult to distinguish such a charge or employment from an office, or the person who performs the duties from an officer."

What is here said must be considered with direct reference to the facts in the case admitted by the demurrer. "The bond on its face purported to be an official bond, and not in the nature of a contract. The condition referred to no contract, stated no undertaking to perform any specific act, refers to nothing, describes nothing which the obligor was bound to do except to perform the duties of an officer. It recites that he was appointed to an office, and declares 'that the obligation is to be void, if he shall truly and faithfully execute and discharge all the duties appertaining to the said office.'" The bond, then, the chief justice says, "is, on its face, completely an official bond, given, not for the performance of any contract, but for the performance of the duties of an office, which duties were known, and had been prescribed by law, or by persons authorized to prescribe them" (p. 99). And the chief justice says, that the attorney of the United States had necessarily taken up that idea and proceeded on it, for in his assignment of breaches he alleges, that he had not performed the duties of the said office. "On this breach of his official duty, which is alleged to constitute a breach of the condition of his bond, the action is founded."

On page 104, in answer to the question, has the office of agent

of fortifications been established by law, the chief justice says, from the year 1794, to the year 1808, congress passed several acts empowering the President to erect fortifications, and appropriating large sums of money to enable him to carry these acts into execution.

We feel justified in inferring from all that is stated in this opinion, that a system of fortifications for the general defense had been established, and agents appointed " whose duties partook of those of a purchasing quartermaster, commissary and paymaster," " which duties, if not performed by contract, were performed by persons who were considered as officers of the United States, whose offices were established by law."

The chief justice might well say, that, the duties of this agent being continuous, existing so long as the system should endure, he was an officer connected with the national defense. We hardly think it possible, had the principal obligor in this bond been appointed merely to superintend the erection of a single fortification, his duties ceasing when the work was accomplished, that he would have been held to be an officer.

It is not contended that the magnitude of the object, or amount or varieties of duties imposed to carry it out, determines the character of the employment, or will convert that which was a mere employment, temporary in its very nature, into an office ; it is only their continuous nature that will have that effect. If this be so, then the many road commissioners and the many other agents of the State nominated in the law, out of which the duties spring, are officers (which no one maintains), for their duties are prescribed by the law, and are continuous until the object of their appointment is accomplished.

The agent of fortifications, in the case cited, was connected with a system which formed a part of the system of our national defense, executed a bond as an officer connected with that system whose duties were continuing so long as the system should continue. Those duties were, in no just sense, of a temporary character, but enduring, permanent, and in this sense we apprehend the word " continuing " was used by the distinguished judge. The agent was appointed to aid one of the

departments of the government, under whose control was a vast system permanent in its very nature.

It seems to us, that it cannot be predicated of these plaintiffs in error, that their duties are of such a character that a general duty continues, as in the case of the agent of fortifications, although the special duty has been performed. In fact there are no general duties imposed by the act in question on these appointees; they have only one single special duty to perform, and that is, to superintend the erection of a State house, and when that is performed their functions, *ipso facto*, are at end. Not so with the agent of fortifications; his functions were not ended on the completion of one or more fortifications, for they were general and comprehended all the fortifications embraced in the system of defense.

It seems to us, the term " such officer," judging from the contemporaneous action and construction of the clause by the legislature, had reference alone to such officers as had some portion of the functions of government committed to their charge. No man can certainly say, to which of the three departments of our government these appointees belong. It will not do to say they belong to the executive, because they are required to execute a law. The same may be said of road commissioners: they execute the laws under which they derive their appointment, and so of the numberless persons necessarily employed by the State in subordinate positions and for a special purpose. So far as we have any knowledge on this subject, or are enabled to judge from the facts of contemporaneous history, no one has ever supposed the legislature had not full power to appoint and employ all such agents as might be deemed necessary by them to perform duties not of a permanent, but of a transient and incidental character, such as we see in abundance in our statute books. No one has ever exalted such employees to the position of an officer, though their duties might require months or years for their full performance. There is no enduring element in these employments, nor designed to be; the duty being performed, the place is vacant by the very fact of performance.

The case cited, of *Shelby* v. *Alcorn*, 36 Miss. 273, is based

upon this case in 2 Brock., and was a case where a system of levee protection against the inundations of the Mississippi river was inaugurated, and the functionary to superintend the work was denominated by the law an officer, the tenure of the office established at two years with a salary of $1,500 per annum; and the decision seems to be placed on the fact, that the duties of the office were continuous, and were a part of the permanent administration of the government. On his report as to the cost of the work, the board of police were required to levy a sufficient tax *to meet it;* and the court held, that the powers attached to the office pertained to the executive branch of the government, that it was of a permanent nature and had a certain tenure prescribed, and the appointees were clothed with a portion of the executive and sovereign power of the State.

This surely cannot be predicated of these appointees. No tenure of office is fixed by the act, no permanency is attached to it, nor is there the slightest connection with the exercise of any portion of the executive power, or of any departmental powers, and no intention manifested in the act itself to establish an office. The appointees are to perform a duty single in itself, which the legislature could not of and by itself perform, — that is, to superintend the erection of a State house, and disburse the moneys the legislature may appropriate to such purpose. No power is given to levy taxes, and no govermental act is to be performed by them. It is only by the advance of civilization and refinement that costly edifices are erected for worship or for legislation. " The groves were God's first temples," and high conclave of the magnates of the land has in former times been held with no other roof tree than the broad canopy of heaven. Government can be administered without such structures, and an agent who superintends their erection cannot, with any propriety, be said to perform a function of government.

The case of *The State of Ohio* v. *Kennon et al.,* 7 Ohio St. 546, is also referred to, as conclusive on the point.

That was a case where the legislature had bestowed upon the individuals named in the act — Kennon and the others —

a portion of the appointing power lodged in the executive department of the government by the Constitution. The court said, and very correctly, the exercise of the power of appointment and removal of State officers and the filling of vacancies which may occur in State offices, is a high public function and trust, and not a private, or casual, or incidental agency, and the officers of a board so created by statute to exercise these public functions, are vested with official State power, and hold and exercise a public franchise and office.

The case of *Dickson* v. *The People, etc.*, 17 Ill. 191, decides that a director of the State institution for the education of the deaf and dumb, holds an office of honor, and hence, accepting an office under the United States, such acceptance vacated the office of director, which was an office of honor, within the meaning of the Constitution. He was nominated by the governor, and appointed by the Senate, and his place was denominated an office.

The case of *The People* v. *Ridgely et al.*, 21 id. 65, merely holds that the trustees of the bank whom the governor wished to supersede, were not officers, and of course not subjects of executive power.

The case of *The People, etc.*, v. *The Comptroller of the State*, 20 Wend. 595, decides, if commissioners to erect a State lunatic asylum are to be regarded as holding an office, they could be removed from office by the power that appointed them; and the court, NELSON, Ch. J., in delivering the opinion, said, he was inclined to think they are to be regarded as holding an office, being recognized as such, twice in the statute, and there being no fixed time during which they were to hold, they were removable by the power that appointed them.

We deem it unnecessary to examine other cases cited by the counsel for defendants in error, having commented on those regarded as the most leading and authoritative.

Several cases are cited on behalf of plaintiffs in error having a bearing on the question at issue, which we have examined. The first is the case of *Sheboygan County* v. *Parker*, 3 Wallace Sup. Ct. U. S. 93. The case was this: The Constitution

of the State of Wisconsin provides that "all county officers shall be elected by the electors of the respective counties." The legislature passed an act authorizing the county of Sheboygan to aid in the construction of a railroad, and constituted certain persons named in the act a board of commissioners for aiding the project, who were authorized to borrow money on the credit of the county, and to issue its bonds therefor. The bonds were to be signed by the president and secretary of this board and countersigned by the clerk of the regular board of supervisors, or by the county treasurer. On a suit being brought on some of the bonds or warrants issued by this board, to enforce their payment, the question was made whether the act constituting the said board was constitutional and the county bound. It was insisted that these persons invested with power to levy taxes on the people of the county were county officers, and should have been elected by the people.

The court said, "such persons, in the performance of their special duty, are in no proper sense county officers. They do not exercise any of the political functions of county officers, such as levying taxes, etc. They do not exercise continuously, and as a part of the regular administration of the government, any important public powers, trusts, or duties. An officer of the county is one by whom the county performs its usual political functions, its functions of government."

As illustrating the distinction between an office and an employment merely, the opinion of the judges of the Supreme Court of Maine, reported in 3 Greenleaf, 481, is cited.

The governor of Maine propounded to those judges this question: "Is the office of agent, under the resolve of the sixth instant, authorizing the governor to appoint one or more agents for the preservation of timber on the public lands, and for other purposes, a civil office of profit under this State, within the meaning of article 4, part 3, of section 10, of the Constitution, so that no senator or representative of the present legislature can constitutionally be appointed as agent?"

The answer was, and in which Mr. Justice Weston, eminent

for all the attributes that distinguish the jurist, concurred, that it was not such an office. Remarking that, by the Constitution of that State, like our own, the sovereign power resided in three distinct departments, namely, the legislative, executive and judicial, they say there is a manifest difference between an office and an employment under the government; that they understood that the term "office" implied a delegation of a portion of the sovereign power to, and a possession of it by, the person filling the office, and the exercise of such power within legal limits constitutes the correct discharge of the duties of such office. The power thus delegated and possessed may be a portion belonging sometimes to one of the three great departments, and sometimes to another; still it is a legal power which may be rightfully exercised, and in its effects will bind the rights of others, and be subject to revision and correction, only according to the standing laws of the State. They say, an employment merely has none of these distinguishing features. And they further say, that every office, in the constitutional meaning of the term, implies an authority to exercise some portion of the sovereign power, either in making, executing or administering the laws.

The question was, of course, decided in the negative.

The doctrine of this opinion has not been questioned, so far as we are advised, by any court, and it commends itself to our unqualified approbation by the soundness of the argument by which it is maintained. Other cases decided in Pennsylvania, Delaware, Indiana and Iowa have been referred to as having a bearing on this question, on which we have not time to comment.

We have not been able to bring our mind to the conclusion that the plaintiffs in error are "such officers" as were in the contemplation of the convention which framed the Constitution, as the practice under it, ever since it was ordained, strongly tends to show. That it is legitimate and proper to refer to the practice under a law, for a long series of years and unquestioned, so it is equally legitimate and proper to refer to the practice under the Constitution for the same purpose. In

the case of Dickson, 17 Ill., the *Commonwealth* v. *Dallas*, 3 Yeates, 303, was cited, wherein it will be seen the Supreme Court of Pennsylvania undertook to determine to what the word *judge*, in the Constitution, was intended to be confined, and they came to the conclusion, that it was not every judicial officer that was included in the prohibition of their Constitution; that it was intended to be confined to such judges only as were thus distinguished by the existing laws of the State and general language of the country. This court deemed it proper, and so do all courts, to put a construction upon words and terms used in the Constitution, as well as in laws or in private deeds or other written instruments.

We are frank to confess there is ground for two opinions on the points before us, but we are strongly persuaded the plaintiffs in error, though occupying a position of great responsibility, are not officers in the sense of the 12th section of article 4 of the Constitution, but employees for a single purpose, — that of superintending the erection of a new State house, at daily wages, their employment ceasing when the structure is built.

Nor are we entirely satisfied that they have been placed in this employment and service in a mode and manner prohibited by that article.

When we consider the old Constitution, and the mode of appointment to office under it, we will find it was by the joint action of the senate and house of representatives composing the general assembly, thus making the legislative power the sole appointing power. That power appointed or elected by joint vote nearly all the most important officers of the government, and it was this mischief this article was designed to remedy. The legislative power dominated the executive power, by their action in joint conclave, performing what is properly an executive function. Should the general assembly, by the joint action of the two houses, appoint or elect a person to an office established by the Constitution or created by law, no one could doubt such action would be in derogation of this article. In this case, they have done no such thing. In the exercise of their legitimate and most appropriate functions, they have

passed a law in strict pursuance of all the requirements of the Constitution, in which law they have given employment to these plaintiffs in error, involving the superintendency of the erection of a new State house, and have agreed to pay them for their services five dollars a day each for time of actual service. No franchise is conferred upon them, nor are they required, as they would have been if the law makers supposed they were officers, to take an oath to support the Constitution of the United States or of this State. Art. 3, § 30. They exercise no governmental functions, but perform duties for a stipulated *per diem* allowance, which the legislature, in the exercise of their power to make laws, have defined in the law under which they are employed.

We are called upon by the defendants in error, to declare this law enacted by a body composed in great part of eminent lawyers, and all of them sworn to support the Constitution, and approved as a law by the executive, also distinguished in that profession, and sworn also to support the Constitution, that two co-ordinate branches of the government have violated the Constitution in giving these plaintiffs this employment. We cannot oust them from their places without declaring this act to be unconstitutional, null and void.

While the power exists in this court, and must, from the nature of our institutions, and be exercised, to declare an act of the legislature unconstitutional and void, in such an inquiry the principles by which the court should be guided are clear, on well settled authority. The presumption is always, and should be, in favor of the validity of a law.

As this court said in *The People, etc.,* v. *The Auditor of Public Accounts,* 30 Ill. 434, and has repeated at the last term of this court, in the case of *The Board of Supervisors of Bureau County* v. *The Chicago, Bur. & Quincy R. R. Co.,* 44 Ill. 229, and in other cases, we always approach questions of this nature with reluctance, and with great diffidence, for the legislature is a co-ordinate department of the government, whose exclusive province it is to make laws. But the Constitution is supreme over all the departments of the government, and it is

for the judiciary so to declare, and to bring all enactments of the legislature to that standard — to test them by its provisions when a question is made touching their validity, always remembering that only in a clear and palpable case will the court pronounce against the validity of an enactment. If it be doubtful, the doubt is usually solved, and should be, in favor of the legislative power.

There must appear a manifest assumption of authority, and clear incompatibility between the Constitution and the law. In a doubtful case, the interference of the judiciary can never be, and never is, permitted. Such is the doctrine, not only of this court from its earliest origin, but it is the doctrine of all the courts of the several States of this Union.

The case being a clear one, in no degree doubtful, this court has pronounced against a law, but always reluctantly.

We by no means consider this a case demanding the exercise of this mighty power of the court. We are not satisfied the plaintiffs in error are holding an office, in the constitutional meaning of that term, but are employed to perform a special duty under a law which the general assembly had full power and competent authority to pass.

Entertaining these views, the judgment of ouster pronounced against them by the Superior Court must be reversed, and the plaintiffs in error restored to all they may have lost thereby.

*Judgment reversed.*

WALKER, J. I fully concur in both the reasoning and conclusion announced in the foregoing opinion.

Dissenting opinion by Mr. JUSTICE LAWRENCE:

This case is so important, both in its immediate results and in the principles upon which its decision turns, that I deem it proper to state briefly the reasons why I can not concur in the able opinion of the chief justice speaking for the majority of the court.

The 12th section of the 4th article of the State Constitution provides, that " the governor shall nominate, and, by and with the

advice and consent of the senate (a majority of all the senators concurring), appoint, all officers whose offices are established by this Constitution, or which may be created by law, and whose appointments are not otherwise provided for; and no such officer shall be appointed or elected by the general assembly."

The 23d section of the 5th article provides, that the "election of all officers and the filling of all vacancies which may happen by death, resignation or removal, not otherwise directed or provided for by this Constitution, shall be made in such manner as the general assembly shall direct, *provided*, that no such officer shall be elected by the general assembly."

The object of this twice expressed prohibition of legislative appointments to office is apparent. It was to guard the purity of the legislature, by taking from it the power of creating lucrative or important places, and bestowing them on personal or party adherents. This constitutional provision should be so construed as best to effectuate its purpose.

The legislature, at its last session, passed an act for the erection of a new State house. It provided that the building should not cost a sum exceeding $3,000,000, and authorized the expenditure of $450,000 before the meeting of the next general assembly. The fourth section of the act names certain persons as commissioners to superintend the erection, and requires them, before they enter upon the discharge of their duties, to enter into bond to the governor, with approved securities, in the penal sum of $25,000, conditioned for the faithful performance of said duties, and to take an oath that they will well and truly discharge all their said duties as commissioners. The governor is authorized to fill all vacancies occurring in the board, by the appointment of new commissioners who are to hold their places until the next session of the general assembly. The governor is also authorized to remove any commissioner for cause and fill the vacancy. The commissioners have power, in conjunction with the house and senate committee, to determine upon the plan of the building. They are authorized to expend the $450,000, now appropriated, and will have the same right as to all future appropriations until the edifice is com-

pleted, unless the law is changed. They are to receive five dollars per diem for their services.

The question before us is, are these commissioners officers, in the sense in which that term is used in the clause of the Constitution already quoted, and if they are, was the mode of their appointment in harmony with that instrument?

What is an office?

Blackstone defines the word as follows: " Offices are a right to exercise a public or private employment, and to take the fees and emoluments thereunto belonging." 2 Com. 36.

Kent gives this definition: " Offices consist in a right and correspondent duty to exercise a public or private trust and to take the emoluments belonging to it." 3 Com. 454.

These definitions are not dissimilar, and they are substantially the same which are given by all the authorities. It will be observed that the legal sense of the term does not differ from its popular use.

But in some cases which have arisen in this country, where the question was similar to the one now before us, and it was contended, as in the present case, that the law had not created an office, it became necessary to define the term with more rigorous accuracy. Thus, in the case of *The United States* v. *Maurice*, 2 Brock. 103, Chief Justice MARSHALL said: " An office is defined to be a public charge or employment, and he who performs the duties of the office is an officer. Although an office is an employment, it does not follow that every employment is an office. A man may certainly be employed to do an act, or perform a service, without becoming an officer. But if the duty be a continuing one, which is defined by rules prescribed by the government, and not by contract, which an individual is appointed by government to perform, who enters upon the duties appertaining to his station without any contract defining them, if those *duties* continue, though the *person* be changed, it seems very difficult to distinguish such a charge or employment from an office, or the person who performs the duties from an officer." It will be observed that Chief Justice MARSHALL has here added, to the elementary definitions of the

books, a means of distinguishing a mere employment from an office. The distinction lies in the fact that, in the one case the duty is a continuing duty, and that the place and duties remain though the person dies, or is changed, and this constitutes an office. But when the service to be performed is an isolated one, where the duty is not continuous, as where the legislature authorizes an individual to sell at auction and convey to the highest bidder a piece of land belonging to the State, this is not an office, but a mere employment. The distinction thus drawn by Chief Justice Marshall has been generally adopted by the American courts.

Now, if the meaning of the term "officer" is truly expounded by the foregoing authorities (and no cases denying its correctness have been cited), the argument is really at an end. These commissioners are executing a public trust of the highest importance; they are clothed with power to expend the public treasure to an immense amount; their duties are continuous, as they are certain to extend over a term of years, and that term will probably be a long one; and finally, though the person die, the place remains, and is to be filled by executive appointment. I have tried in vain to discover how these things do not make an office, if, indeed, words mean what we suppose.

The counsel for the respondents, feeling the difficulty arising from these authoritative definitions, have offered another. They say, in one of their printed arguments, "an officer, within the meaning and intention of the constitutional provisions, is one who exercises *continuously*, and as part of the *regular* and *permanent* administration of the government, important public powers, trusts and duties by whom the county or State performs its usual political functions, — its functions of government."

The idea sought to be here conveyed is, that a public trust, no matter how momentous, is not an office unless it is "a part of the regular and permanent administration of the government." This definition I consider radically erroneous, and its error is best shown by bringing it to the test of conceded facts.

I take, as an illustration, an instance cited in another part of the same argument. The counsel say the legislature of Illinois have repeatedly appointed an attorney, by name, to attend to a particular litigation, and this did not create an office, but a special agency or employment. They also say, that at the last session, the legislature created the place of attorney general and provided for its being filled by executive appointment, and this was an office. But suppose the legislature had expected the State to be largely involved in litigation for the next four years, and that such litigation would terminate within that period, and, acting on this supposition, in creating the place of attorney general, had provided that it should continue four years and no longer. Counsel would not deny that the legislature had created an office, but yet the office would not be " a part of the regular and permanent administration of the government." On the contrary, the place created would be exceptional and temporary. Again, suppose, during the late war, the State had thought proper to organize a force of home guards, to be made up of men exempt from the conscription of the general government, and had provided in the law that all offices connected therewith should terminate with the suppression of the rebellion, and the force should be then disbanded. Would there have been no offices here, but only agencies or isolated employments? And yet these offices would not have been " a part of the regular and permanent administration of the government." It is plain that, if this definition of counsel be accepted, the legislature could create the most important public trusts, and fill them by its own appointment, by merely avoiding the use of the term " office " and limiting the duration of the place or trust. The constitutional prohibition would thus be frittered away.

But, while I deem this definition fatally defective, yet, if I were to accept it, it would not change my judgment that these commissioners are public officers. They *are* clothed with what the definition terms "important public powers, trusts and duties," and these powers, trusts, and duties *are* " a part of the regular and permanent administration of the government." In

every civilized and wealthy State, the erection of public edifices
for the transaction of the vast business pertaining to the vari-
ous departments of the government, or for the advancement of
public charities, such as asylums for the blind, the insane,
the idiotic, the deaf and dumb, or for the benefit of public
instruction, form no mean part of "the regular and permanent
administration of the government." In some countries, what
is known as the bureau or department of public works consti-
tutes an important branch of the administration. The State
house in question is of course intended to furnish accommoda-
tions for transacting the business of the senate and house of
representatives, the governor, the secretary of state, the auditor,
the treasurer, the superintendent of public instruction, and of
the Supreme Court. Now, to furnish requisite facilities for the
business of these great departments of the government is neces-
sarily a part of "the regular and permanent administration of
the government." If the legislature should create a board of
public works, and should define their duties to be, to build an
edifice, first, for the accommodation of the general assembly,
and, then, another for the use of the Supreme Court, and to
continue until a building had been erected for the convenience
of each of the offices above named, with no limit as to time,
and clothed with power to expend three millions of the public
money, with the probability, drawn from all past experience,
that in the end it would amount to a vastly larger sum, it
would hardly be denied that such a board had been intrusted
with a most important part of the duties of the State govern-
ment, or that they were officers even in the sense of the defini-
tion I am considering. Yet it does not change the principle
to call them "commissioners" instead of "the board of public
works," or to direct them to build one vast edifice, which shall
accommodate all the departments of the State, instead of erect-
ing one for the benefit of each. In the light, then, even of the
definition furnished by the counsel for the plaintiffs in error,
I am obliged to regard these commissioners as officers.

Various adjudicated cases have been cited by counsel on both
sides in support of their respective views. As I desire only to

27 — 45TH ILL.

state the grounds of my dissent, I shall not enter into a review of these authorities. In my opinion, while there is some conflict in the cases, the great weight of authority is in favor of the proposition that these commissioners are officers. The leading case upon this subject is that in 2 Brockenbrough, already quoted, in which Chief Justice MARSHALL held an agent of fortifications to be an officer of the United States. In *Shelby* v. *Alcorn,* 36 Miss. 273, a levee commissioner was held to be an officer, and in *The State* v. *Kennon,* 7 Ohio St. 546, the same was held as to certain persons authorized by the legislature to appoint commissioners to build a State house. · In *Dickson* v. *The People,* 17 Ill. 191, this court held a director of the State asylum for the deaf and dumb to be an officer in the meaning of the Constitution.

Counsel for the respondents have dwelt at some length upon what they term contemporaneous construction, and have cited various acts of the legislature, passed since the adoption of our present Constitution, in which that body has exercised the same power which is challenged in the present case. While many of the acts cited are wholly unlike the one before us, it must be admitted some of them are, in principle, the same. It is urged that inquiry into the constitutionality of the present law is thus foreclosed.

That long acquiescence by all the departments of the government in a particular construction of a constitutional provision should not be readily overturned, is incontrovertible. But to say that the legislature has acquired a prescriptive right to violate a constitutional prohibition, intended as a limitation of its own powers, because, in a few instances it has violated it without exciting sufficient feeling to cause the question to be brought before the courts, is a proposition which, thus plainly stated, counsel would hardly venture to assert. Under such a rule the Constitution would soon become of little worth, as some of its most important provisions could be abrogated by the very body they were intended to restrain. Our present Constitution had been in force when this act was passed, not nineteen years. If, during that time, the legislature had trans-

gressed one of its plain provisions much oftener than it has, does it follow, when the question is for the first time brought before the courts, that these legislative precedents can release the obligation of the fundamental law? Only in cases of doubtful interpretation are such precedents entitled to grave respect. If the constitutional rule is clear, and its violation plain, the fact that such violations have been repeated is rather an argument in favor of a stern application by the judiciary of the supreme law, when the opportunity is presented, than one in favor of its relaxation. But in all these cases the plain and simple duty of the court is, to inquire how the law is written in the Constitution.

We are told by counsel that the legislature is entitled to great respect from the other departments of the government, and that it is a matter of extreme delicacy to pronounce one of its acts void. We show our respect for the legislature by endeavoring faithfully to apply to the cases that come before us the acts of that body, in harmony with the Constitution. But we sit in this place merely to declare the law, and if legislative enactments are unconstitutional they are simply not the law, and we must so pronounce. That our judgment on matters of this sort should be biased by our respect for the general assembly, I deny. One of the chief reforms sought to be attained by the present Constitution, as those who were in the State when the convention of 1847 was called will well remember, was to take from the legislature the power of appointing judges, and thereby to render the judiciary more untrammeled in bringing legislative acts to the test of the Constitution. Whatever respect may be due to the legislature, that due to the Constitution is still greater.

But it is urged, finally, by counsel for respondents, that, even if these commissioners are officers, their appointment is not to be considered an act of the legislature alone, but the joint act of the legislature and of the governor, and as much of the latter as of the former. It is thence insisted, that their appointment was not a violation of the Constitution. The argument is sophistical and would sacrifice the substance to the shadow. The

object of the Constitution was to keep corruption out of the legislative chambers so far as the strife for legislative appointments might tend to introduce it there. This clause should be so construed as to promote its object. Yet, is it not apparent, that the power of appointment by a bill to be approved by the governor would be in all respects as objectionable and as much within the mischief sought to be cured as an election of officers by a vote? And, indeed, the Constitution seems to have anticipated this position of counsel, for it expressly provides, that "no such officer shall be *appointed* or *elected* by the general assembly."

Nothing can be clearer than that the convention intended the legislature should have no voice in filling offices, either by appointment, as in the present case, by an act or bill, or through the medium of an election. It would be a perversion of language to say that the governor has here exercised his appointing power. What right of selection has been offered to him, or what nomination has he made? A bill is presented to him with the names of certain persons embodied therein, who are to execute the law. He could not veto one section by itself. His only choice was to approve the entire bill, or to return it with his objections. If he failed to do either, the bill became a law in ten days by the mere lapse of time. If he had returned it, a majority vote could have passed it over his veto. It was the legislature, and not the governor, that passed the law, and it was the law that named the commissioners.

I have said all I desire to say for the purpose of showing why, in my opinion, this case should have received a different adjudication. I regret to differ from the opinion of my brethren, whose convictions are as decided as my own; and such is my respect for their opinions, that I have carefully re-examined the entire case. But the more I have reflected upon the questions at issue, the firmer is my opinion that the legislature has plainly violated the Constitution, and that it is our duty so to pronounce. Neither can we be met here by the cry of private rights acquired upon the faith of the law, and to be overthrown by an adverse decision. No such rights have been acquired.

A case could hardly arise in which the constitutional question would be less trammeled by considerations of this character. If a new State house is desirable, another legislature can direct it to be built, but let them do so without trampling upon the Constitution. In my opinion, the judgment of ouster pronounced against the respondents by the Superior Court should be affirmed.